in the United States. The court will ask for a change of audience. We ask that you focus most intensely on whether we have jurisdiction. We have certain doubts that we have a filled audience for everything else as well. You may proceed. First, Mr. D.J. Sauer, public file. Mr. Thomas Barrow. You may proceed. Thank you, Your Honor. You may please the court. John Sauer on behalf of the State Appellants. Your Honor, the audio is not great here, but I believe Your Honor suggested the court's focus on whether or not there's appellate jurisdiction in this case first. So if it's okay with the court, I'll address that in my initial remarks. There is appellate jurisdiction here because as the Supreme Court emphasized in the Gulf Stream Aerospace case, and as this court's precedents have reaffirmed in cases like Rauscher Pierce, where a state order has the effect of denying an injunction, that is an appealable under 1292A1 of Title 28. Gulf Stream Aerospace said that, for example, that orders that have the effect of denying an injunction and that have serious, perhaps irreparable, consequences are appealable orders. And I think that's what we have in this case. And I point the court's attention to what this court stated in Rauscher Pierce when it pointed out saying, well, certain state there is dealing with issues about whether staying proceedings pending arbitration is appealable, concluding that's not. It contrasted that, for example, by saying whether a stay has the effect of denying an injunction, quote, such as when a court stays proceedings in which one party seeks a preliminary injunction. So this court said, hey, look, the textbook example of what is appealable is when the case is stayed while a motion for preliminary injunction is pending. And that's what occurred in this particular case. The motion for preliminary injunction was filed in early November. It was fully briefed by mid-December. There was then consolidation and briefing on motions to dismiss and no ruling until February as parties in the other case that was consolidated with were briefing motions to dismiss. DOJ filed a motion to dismiss later. That was all fully briefed. And then in late February, there's the order saying I'm going to stay this entire case, including the preliminary injunction motion, until most likely late June when the Supreme Court would decide the Texas against Biden decision, the MPP, or Migrant Protection Protocols case. Yes, slow down just a little bit. Slow down just a little bit, please. Your pace of speaking is quite rapid. I apologize, Your Honor. I'll do my best. Just slow it down just a little bit. We have plenty of time. Have a better cadence. You've come south, so we're going to slow it down a little bit. One of the points I would emphasize is that the questions presented in the Texas against Biden case do not relate to standing and reviewability. The Supreme Court usually only considers the questions presented in a cert petition. So there's the Texas Biden decision from this court from last December. That's at 20-F-4-9-28. That does address a lot of issues of standing and reviewability, and we rely heavily on that before the district court and this court. That is under cert review in the U.S. Supreme Court, but the questions presented in that case are distinct from standing and reviewability. They're really narrow, and they're quite specific to that case. It has to do with whether or not the mandatory detention policy that's set forth in the INA requires the government to continue implementing MPP. There's nothing like that in this case. And then whether or not the government or DHS could kind of cure its arbitrary and capricious memorandum by issuing a new memorandum while the case was pending on appeal. Those are the two questions presented. They're very different than the things we're relying on that case for and have relied on that case. I'd make another point on this, which is that all the principles relating to standing and reviewability set forth in this court's case in Texas against Biden rely on principles that are deeply rooted in U.S. Supreme Court jurisprudence. There's really no, at least reasonable probability, there's going to be a seismic change there. You know, principles set forth in the regent's decision, the state farm decision, decisions like that. So even if the district court... Let's assume your prediction about all that is correct, because you've got to predict what's going to happen, what the effect of that decision will be. Is that what you're doing there? Well, essentially, it is true that we cannot know for sure what the U.S. Supreme Court will do in that particular case, but we do know that we're suffering irreparable consequences on a daily and monthly basis while the case is under consideration. Irreparable consequences? Yes, yes. You're talking about a two-month stay. Now it's probably less than that, probably maybe the end of June. And you're saying, because you agree, we don't have jurisdiction unless there's some determination that this is an effective denial of a motion for preliminary injunction. That is correct. Other than that, we have no jurisdiction. So how is a stay of a couple of months an effective denial of your motion for preliminary injunction? Whatever your predictions are about Texas v. Biden. I'd make two points in response. The first one, of course, is every single day we suffer irreparable consequences, both now and in the future, because every month that we're delayed in getting judicial relief, which would be an order compelling them to adopt a policy that does involve construction of a border wall. It involves increased illegal immigration in our states now where we have financial harms that we cannot ever kind of recover. Do you have any empirical data to support your contention that it's costing us economically all this money every day that goes by? What data do you have to support that state? Yeah, I would point the court to the declarations we submitted in support of standing, which facts were not disputed, essentially that point to our increased... I got time for you to tell me what that is. That's it. I don't have this precise record on appeal pages there, but they're all attached as exhibits to our preliminary injunction motion, and they relate to increased health care costs, increased education costs, increased driver's license costs. I mean, these are all very firmly rooted in both Supreme Court and Fifth Circuit doctrine as creating Article III standing and constituting irreparable harm, and I would point out to the court that that evidence... So you're saying it's costing us because you say it's costing us? Yes. Well, it's costing us because if you look at those declarations, they provide an empirical basis that fleshes that out. One example... Sorry, go ahead, Your Honor. Go ahead. Tell me what that is. One example of that, for example, Your Honor, is our contention is that if you look at DHS's prior policy decisions, and I emphasize here the October 2020 memorandum from DHS that set forth, I think, a record on Appeal 1275 and following, DHS found as a matter of empirics that when walls are constructed and there's a policy in favor of wall building, that does, in fact, deter and prevent illegal immigration. So that's the first step in our causal chain that shows our irreparable consequences, and that's backed up not just by DHS's own documents, but it's also backed up by the Statutes of the United States, because 8 U.S.C. 1103 note that both parties rely on, which was passed in 2007 by overwhelming bipartisan majorities, states that the Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers to deter illegal crossings in areas of high illegal entry. So the U.S. Congress also determined that construction of barriers, especially in the high-crossing areas, does, in fact, deter illegal immigration. And from there, as this court said in Texas against Biden, the causal chain is the increased illegal immigration to the financial harms to the states. But we're talking about two months. Well, yes. You're telling me a wall could be up in, what, four weeks from now? Oh, no, not at all. I believe that there would be a preparatory process for any— How is it that these two months that we're talking about matter that much? I would say two things that matter. First, that every month of delay now pushes out further when they're actually going to start construction. So suppose they're ordered to adopt a policy that's pro-construction, and they say, well, look, it's going to take us a year to do NEPA analysis and acquire land and so forth. Fine, they may be able to do that, and it would depend on the facts of the case. But two months of delay now before they're ordered to do that is too much of a delay. How long have we been without the wall? I'm sorry? How long have we been without the wall? There's too—all this terrific damage is going to flow from these two months. How long have we been without the wall? Well, that's a mixed answer to that question, because, of course, there was substantial construction activities going on in late 2020. We don't have the wall. We don't have the—we've been without the wall for a good long while. In fact, the barriers were constructed in the Yuma sector, the RGV sector, the San Diego sector. These are all discussed at record on Appeal 1275 and following. And it was affirmatively found by DHS, based on these detailed empirical assessments, that they did, in fact, they did successfully defer, and they permitted redeployment of resources across the border. There's a great example in DHS's own documents when they talk about, for example, they put up 12 miles in San Diego, and that freed up 150 border agents every 24 hours that were then redeployed to other sectors to increase border security. So even a partial construction of the wall, especially in what Congress said is areas of high illegal crossing activity, has the predictable effect, the predictable consequences, in the U.S. the predictable consequences of stemming or partially stemming the flow of illegal immigration, which, of course, has been at crisis levels for well over a year now. And that, of course, puts an exclamation point, so to speak, on ongoing irreparable injury. And the court has pointed out that we're now at the place where it's two months. But, of course, we've been asking for a preliminary injunction going back to last November. Again, as soon as the court's order came out in February, we filed a notice of appeal. We asked the court again for an injunction pending appeal. Then in early March, as soon as the appeal was docketed here, we asked for an injunction. So we have been asking for much longer than two months for a preliminary, for an injunction pending appeal and a preliminary injunction from the lower court. Now that the case has been sort of consolidated, the injunction pending appeal has been consolidated with the merits of the PI appeal, I think it would be very appropriate for this court to either enter the injunction itself or remand with instructions to enter that injunction without further delay, because this court's case law strongly supports the proposition, strongly supports the proposition that we are undergoing irreparable injuries and have been doing so going all the way back to November at the latest, and probably much earlier than that. I mean, one of the key points in this case is that it's just indisputable, based on the public statements, the documents, and finally the border construction contract termination decision, that DHS has adopted a firm decision and a clear policy that they will not build another foot of border wall. That's reflected in the president's proclamation where he says that it is not the policy of this administration, or it is the policy of this administration that no more taxpayer dollars be diverted to construct a border wall. That's reiterated on page one of the border wall plan from June that DHS put forth saying, our plan, which involves spending only on preparatory activities, environmental remediation, stakeholder consultation, and things like that, they said our plan is consistent with President Biden's commitment that no taxpayer dollars shall be diverted to construct a border wall. The problem with that is there's a statute that says the secretary shall construct a border wall, and there are two appropriation bills at issue in this case that say $2.7 billion shall be used only for the construction of barrier policy. So the policy that they clearly have, the firm decisions they've made, is an illegal policy, and that's why, you know, in their legal pleadings there, they can't quite admit that whether they do or don't have this particular policy. But I think it's clear to the court that the policy exists. And if that policy exists, it's manifestly illegal, not just on the basis of that statute, not just on the basis of the appropriations bills, but also under the APA. This would be textbook APA violation because nothing is clear that as of 2020, DHS had a very firm policy in favor of wall construction. There's a 2018 memo saying walls work. There's the 2020 memo explaining how walls have worked. They've explained how they will be able to build barriers within nine months of receiving funding and appropriation for them. And so there's been an 180-degree reversal in the current administration from walls work and we are building them as fast as we can to walls don't work and we will never build another foot of wall. That's a policy change, but it's absolute bedrock principle in administrative law that if you change in a policy, the agency has to give some explanation, some reason explanation in the words of the Prometheus radio case. And in fact, in the Fox television case from the U.S. Supreme Court states that the agency must, quote, display awareness that it is changing positions and it may not depart from the prior subsilentia. And that's exactly what they're trying to do here. They don't want to quite say that, hey, we've made the decision internally. We're never going to build another foot of wall. Although Secretary Mayorkas' public statements, the president's public statements, all those provide powerful evidence that that is the policy. But they don't come out and say the policy. They're trying to change the policy subsilentia. And that's like, you know, step one, a textbook violation of the APA. It violates the APA in at least four other ways. They gave no consideration to state reliance interests. This court in Texas against Biden said it's astonishing that DHS would, you know, have a change in policy where they wouldn't consider that after the regent's decision. Again, they disregarded their own factual findings. We got specific factual findings from DHS in the record about it. But you want us to issue a preliminary injunction? That was our ask and our motion for injunction pending appeal. Now that that's been consolidated with the merits of the PI appeal, the court could either do that at its discretion or remand with instructions to the district court to enter a preliminary. What would those instructions be? I believe that it probably. The district court, what would we instruct the district court to do? I think a good, what we'd ask the court to do is remand with instructions to enter the preliminary injunction that we submitted in our proposed order, which is in the record. I can't remember the record on appeal site, but it's a two-page proposed order that has basically four elements to it. The first element is you cannot implement the border wall proclamation. And then as we said in our motion for injunction pending appeal, the directive should be that they have to implement a policy in good faith. That was the phrase used by this court and the district court in the MPP case that says you have to have a policy in favor of wall construction that's to be implemented in good faith. So the instructions would be we remand with instructions to enter a preliminary injunction that specifies that they have to have a policy in favor of wall building in good faith. The specific language is in the proposed order we put before the district court and in the opening pages in the last page of our motion for injunction pending appeal. I guess this is very difficult for me to see how we can make these factual determinations about false intent versus good faith and pretext and all of that without any . . . There's been no preliminary hearing. There's been no hearing. And I submit . . . That's what you're asking us to do though, isn't it? To make that determination in either order that they issued, that the district court issued an injunction, or you want us to do one with no hearing. That'd be our preference. Now, another course for the court . . . No factual hearing though. Well, if we've submitted factual evidence that's not in dispute, for example, in the MPP case, there was only oral argument at the hearing. It was based on factual submissions that are very similar to this. And I . . . Well, you use the language pretext in your brief, don't you? Uh, yes. You're not going to agree that what they're doing is pretextable? Uh, I think it . . . I would . . . Well, he'll tell me. And I see my red light as I just point the court to the, what it said in BST Holdings about that very issue. So, thank you, Your Honor. May it please the Court. Thomas Byron from the Department of Justice, here on behalf of the Federal Government Defendants. We're appellees in this court. I recognize, Judge Dennis, you had asked us to address first the question of appellate jurisdiction. And I'd be happy to do so, but if I may first make two overarching points that I think are really critical to understanding this case. First of all, DHS is compliant with the governing law, including the Appropriations Acts and the Impoundment Control Act, as well as IRO. GAO recently reached that conclusion in the exercise of its own expert judgment, and it was correct. Secondly, federal courts are the wrong place for the kind of political disagreement that the plaintiff states seek to bring in this case. This court in Texas 1, page 161, emphasized that there are multiple threshold legal doctrines that exist to, quote, cabin policy disagreements masquerading as legal claims. This is just such a disagreement. So, addressing the question of appellate jurisdiction, we've explained why the ordinary case management order issued by the district court, staying proceedings, on multiple issues before that court, including the defendant's motion to dismiss, as well as the plaintiff's motion for a preliminary injunction, was not appealable. Those kinds of stay orders, timing questions about when a court will decide a motion, are ordinarily not appealable. And I'm not going to address the rationale the court gave for that, because it's not before this court. And it's just simply not an order that courts of appeals will review. There are exceptions to that rule, but they're narrow, and they don't apply in this case. So, the exception, as this court has explained in cases like Rauscher and Cherry AD, exists where there has, first of all, been a practical denial of a request for injunctive relief. Secondly, where there would be serious, perhaps irreparable consequences that may be remedied only by an immediate appeal. And it's those last two prongs, in conjunction with each other, that demonstrate why this order in this case is not properly before the court of appeals. First of all, the plaintiffs have to show not just serious consequences at some stage, because as this court explained in Cherry AD at footnote 15, mere delay is not itself the kind of irreparable harm that brings an appeal within that narrow exception. They must show instead that, as the third prong emphasizes, any harm could be remedied only by an immediate appeal. And Judge Graves, you asked a series of questions to my friend on the other side about what harm would take place within the brief period of a few months while the district court's order remains in place, before the preliminary injunction order is resolved below. And there are none. There are none that are identified in the record, and the plaintiffs haven't identified any here. Remember, the only difference between the world that we live in and the world that they seek to live in is the timeline for construction of a barrier system in the Laredo sector using fiscal year 2020 funds. Plaintiffs don't seriously dispute that fiscal year 2021 funds are properly used to remediate and complete projects transferred from the Department of Defense to DHS. The real question here is how quickly construction will begin on the project in the Laredo sector. The DHS plan and the Enriquez Declaration make clear two really important things. First of all, at the time of the proclamation in January of last year, the project in the Laredo sector was not very far along. There was a design stage that had been mostly completed, but no land had been acquired. The federal government does not own the land where that project is set to begin. No ground had been broken, and indeed the survey steps had not even been completed. So there was no imminent prospect of completion of construction or even beginning construction at that time. What the proclamation and the DHS plan have done is to take a deliberate approach to that project. The project remains on the plans, in the books, and as the Enriquez Declaration explains, the steps that are going to be taken are, and this is what the GAO decision concluded as well, those steps are lawful, they're permissible, and they're within the scope of appropriations law as well as IRIRA, which is the governing law under which these kinds of construction projects are undertaken by DHS. So I'd be happy to go into that in some more detail if the court has questions, but the critical point is that the difference in the timeline is, first of all, nowhere clearly identified. No one could know what the difference will be. But it's not clear, I should say rather, it is fairly clear that there's no way that the entire project in the Laredo sector would have been completed even by the end of this summer, which is when the district court will turn to the preliminary injunction motion. So there's no way that this appeal can come within the narrow exception identified in Rauscher and Sherry AD or in, as the Supreme Court has explained it, Gulfstream and Carson. I'd be happy to address any questions the court has about appellate jurisdiction or turn to the merits because we think there are multiple threshold reasons why the plaintiff's claims are not properly before the district court and therefore their appeal seeking an injunction must be denied because they're not likely to succeed on the merits of that appeal. First of all, the plaintiffs, the states here, imagine a decision that simply doesn't exist. DHS has never reached a conclusion that it will decline to use appropriated funds for the purpose identified by Congress. And that purpose, after all, is construction of a barrier system along the southwest border. The DHS plan and the Enriquez Declaration make clear that DHS is intended to use those funds and is currently using those funds for that very purpose. The plaintiffs engage in multiple misunderstandings or mischaracterizations, pardon me, of the statements that they rely on in this case. First, they point to language in the president's proclamation about diverting funds. That was a reference to funds, military funds from the Department of Defense and treasury funds in the Treasury Forfeiture Fund that were transferred to build border barriers. And those transfers, those diversions, as the president said, would be ended. That's what was referred to in the diverted language they rely on. Secondly, though, the president's proclamation and the DHS plan both make clear that DHS intends to use these funds for the purpose for which they were appropriated, barrier system construction. But the plaintiffs pretend that barrier system construction can only mean swinging hammers, pouring concrete, and installing bollards. That's not accurate. It's never been accurate. Even in the previous administration, the very same funds in previous UF's appropriations were used for land acquisition, surveys, design, road construction, erosion control, drainage, and all of the many steps that we've identified need to be undertaken here as well. There is nothing unusual about this. Indeed, going back to IRIRA in 1996 when it was first enacted in Section 102, Congress at the time recognized that there would be multiple steps required. And indeed, IRIRA in its original enactment and some of its subsequent amendments, including the Secure Fence Act, are excellent examples of how Congress can specify very clearly both legislative deadlines, particular project locations, length of barriers that it intends the agency to use to complete on a very specific schedule. Didn't do so here in the Consolidated Appropriations Acts that we're looking at, nor in IRIRA itself, which now preserves the discretion of the Secretary of DHS to determine where barriers are best installed. And in IRIRA as well, it leaves to the sole discretion of the Secretary of DHS whether and when and to what extent to waive the requirements of federal laws such as environmental planning requirements under NEPA and other statutes. And IRIRA Section 102 itself imposes the very obligation of consultation with stakeholders that the agency here identified as needing to be completed first before engaging in construction. And indeed, of course, land acquisition, real estate acquisition also must be completed before any construction could begin. And we're nowhere near that stage, nor were we in January of 2021. Fundamentally, though, this is just not a proper APA claim. There's no history or tradition of states using the APA to challenge spending policy planning decisions that are announced by a federal agency before contracts are entered into or concluded or amended or terminated. That's just not final agency action. Indeed, those spending choices are committed to agency discretion by law, as the Supreme Court in Lincoln against Vigil made clear. And for that reason, as well as the speculative nature of plaintiff's standing claims, the claims here are not properly before the federal courts at all. And this appeal should be either dismissed or the decision below, I should say, the order below, affirmed. If the court has no further questions, we'd urge you to dismiss or affirm. Thank you. Thank you, Your Honors. Very briefly, just to address a few of those points that opposing counsel raised. I believe Bruce, he described this as a political disagreement. Certainly, there's a lot of political disagreement about these issues, but this is a legal disagreement because here's what the law says. 8 U.S.C. 1103 note says, the secretary shall take such actions as may be necessary to install additional physical barriers to deter illegal crossings in areas of high illegal entry. The two appropriation bills say that the $2.7 billion shall be available only for the construction of a barrier system at the southwest border. That is law. That's a legal dispute. And on top of that, you have the APA claims. It isn't merely a political disagreement here. Secondly, in discussing the court's appellate jurisdiction, counsel said that we don't have serious, perhaps irreparable consequences here because any building process, even if the court enters an injunction, there'll be a delay before any building process because there's necessary preparatory steps, which we don't dispute that as a matter of principle. But keep in mind that there is a hard stop in September 2024 and September 2025. So what's really going on here is the clock is running out on our claim. Each month of delay now makes it more likely that those preparatory steps, which keep in mind that they're affiant. You know, the Enriquez Declaration in the lower court said, well, our NEPA analysis alone will take 12 to 16 months. And you heard a big laundry list of other preparatory steps that they plan to take before any construction could begin, even if they agree to do so in the Laredo sector or any other sector. So right now, we're just over two years away from a time when these appropriations expire and the money's no longer available to be spent on border wall construction. The clock is running out on our claims right now. Each month of delay, in addition to all the irreparable injury I talked about when I was opening, each month of delay makes it more and more likely that the clock runs out. The DHS is like a basketball team that's passing the ball around in the backcourt while the clock winds down towards zero. That's what's, you know, with the fact support here. Thirdly, he said that the states are imagining a decision that doesn't actually exist. Keep in mind that what we contend is that DHS has made a firm decision and adopted a policy, sub silencio, not to build another foot of border wall. He says, you're imagining that. That doesn't exist. But on September 26th, here's what Secretary Mayorkas said about that. He was asked, well, why don't you build a wall to keep out the current surge in illegal immigrants? And his response was, and this is quoted in our brief, it is not the policy of this administration. We do not agree with building a wall. That's a pretty firm statement, and that was followed very soon thereafter by contract terminations. Remember, there were four contracts in place for construction. Two of them, all that DHS did was they terminated the provisions that called for construction. And the other two, they terminated the entire contract for convenience. So at that point, there's, I would say, an exclamation point on the existence of this policy. Powerful evidence coming from the January proclamation, the June border wall plan, the Secretary's public statements, the termination of the contracts. This policy exists, and if it exists, it contradicts the plain language of that statute that I quoted earlier. It also contradicts the plain language of the appropriation bills, and it's unlawful in the APA for the five reasons that are set forth in our brief. And for all those reasons, we ask the court to either enter a preliminary injunction or remand with instructions to enter a preliminary injunction. Thank you. One more.